1  KEVIN H. MORSE, State Bar No. 253066
   *kmorse@clarkhill.com*
2  CLARK HILL PLC
   130 E. Randolph Street, Suite 3900
3  Chicago, Illinois 60601
   Telephone: (312) 985-5556
4  Facsimile: (312) 517-7593

5  Proposed Counsel for Debtor-in-Possession
   BIO365 LLC

**UNITED STATES BANKRUPTCY COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SANTA ROSA DIVISION**

| | |
|---|---|
| In re<br><br>BIO365 LLC<br><br>     Debtor | Case No. 23-_____<br><br>Chapter 11<br><br>**DECLARATION OF ROBERT MARCUS IN SUPPORT OF CHAPTER 11 CASE AND FIRST DAY MOTIONS** |

I, Robert Marcus, hereby declare under penalty and perjury:

    1.    I am a Managing Director of Kander, LLC ("Kander"), a strategic and financial advisory firm focused on food and agribusiness. On April 7, 2023, I was appointed Chief Restructuring Officer ("CRO") of bio365 LLC, the above-captioned debtor and debtor-in-possession (the "Debtor"). I am familiar with the Debtor's operations, day-to-day business, affairs, and books and records.

    2.    I submit this Declaration in support of the Debtor's Chapter 11 case and the relief sought in the various first day motions filed contemporaneously with this Declaration or shortly thereafter. Except as otherwise noted, all facts set forth in this Declaration are based on my personal knowledge, my discussion with the directors, officers, and other employees of the Debtor, my review of relevant documents or my opinion, based on my experience, and knowledge of the Debtor's operations and financial condition. In making this declaration, I have relied, in part, on information and materials gathered, prepared, and provided to me from Kander, the Debtor, and the Debtor's employees kept in the ordinary course of the Debtor's operations.

    3.    On April 12, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for

relief under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of California – Santa Rosa Division (the "Bankruptcy Court"), commencing the above-captioned bankruptcy case (the "Bankruptcy Case"). The Bankruptcy Case is pending as a Subchapter V, Chapter 11 case and, as such, no committee or examiner has been appointed in the Bankruptcy Case.

**I.    History and Background of Bio365**

4.     The Debtor currently manufactures nine (9) unique, trademarked, and patented living soil products that are custom formulated for indoor, greenhouses, and outdoor cultivators. However, prior to formulating these first-to-market products, the four co-founders of the Debtor set a mutual goal in 2015 to ensure that children and future generations will have access to abundant, healthy food, and high-quality medicine. To do so, they needed to find solutions to the intermingled threat of dwindling topsoil and the instability of climate change.

5.     Bio365 was founded by Jackie Klein, Michael Klein, and John Gaunt with the input and advice from David Shearer. All four founders are members of the board of directors. Michael Klein remains Chief Executive Officer of bio365 and is the former Chairman of Rainforest Action Network. John Gaunt is the Chief Science Officer of bio365, who is a soil scientist and former adjunct professor at Cornell University School of Agriculture who has dedicated his life to helping marginalized communities improve their agricultural success. These founders determined that "Controlled Environment Agriculture" – or CEA – can be an important mechanism to help solve the threat of dwindling topsoil, poor crop quality and the instability of climate change.

6.     On May 17, 2019, the Debtor through a *Contribution Agreement* entered into with Green Tree Group, Inc. ("GTG") acquired the equity interests of Green Tree Garden Supply LLC, a New York limited liability company ("Green Tree"). Green Tree was the owner of certain manufacturing and intellectual property assets and the holder of intellectual property licenses critical to the development of CEA and the future soil products of the Debtor. GTG received equity interests and cash from the Debtor in exchange for its contribution of Green Tree's assets and licenses to the Debtor.

7.     Through the use of the Green Tree assets, the Debtor developed a series of patented,

Case: 23-10180    Doc# 3    Filed: 04/12/23    Entered: 04/12/23 15:45:43    Page 2 of 10

breakthrough technologies that, by helping to improve CEA cultivation, ensured that cultivators will grow more abundant, healthier plants while achieving healthier profits. Just as importantly, bio365's technology improves environmental sustainability, reduces the impacts of chemical fertilizers, improves water efficiency, helps sequester carbon dioxide from the atmosphere, and provides cultivators with an easy — but optional — pathway to transition to organic growing.

8. The Debtor's CEA breakthroughs made an immediate impact on the marketplace. In particular, given the CEA advances through the Debtor's proprietary, activated, and aged bioCHARGE™, the Debtor's products became the preferred soils in the controlled environment industry, primarily for cannabis and produce, to ensure such products are available year-round. Since the Debtor's first year on the market, bio365's soil sales increased year-over-year between 25-45% through 2022, with similar revenue growth projected for 2023.

9. The Debtor's operations and manufacturing began in bio365's facility in Redding, California and, by 2019, included Green Tree's facility in Ithaca, New York. Upon outgrowing the single line manufacturing facility in Ithaca, the Debtor relocated to Cortland, New York (the "Cortland Facility"). The Cortland Facility continues to manufacture the majority of the Debtor's products. Critically, the Cortland Facility is the Debtor's only manufacturing facility capable of producing the Debtor's patented "secret sauce" for its living soil products. To ease servicing clients in the Western United States, bio365 closed its smaller Redding, California facility and, in 2021, undertook efforts to greatly expand operations in California, including leasing a 111,000 square foot warehousing and manufacturing facility in Stockton, California (the "Stockton Facility") with a principal place of business in Santa Rosa, California. The Stockton Facility was intended to complement the Cortland Facility by doubling the Debtor's production of soil and reducing transportation costs of reaching bio365's west coast-based growers. The Stockton Facility is leased to the Debtor pursuant to a *Standard Industrial/Commercial Multi-Tenant Lease*, with more than one hundred twenty (120) months remaining on its term with lease payments escalating to nearly $90,000/month.

10. In addition to its core manufacturing business, through Green Tree, the Debtor also operates a retail store located in Ithaca, New York (the "Retail Store"). Green Tree exists only as a

Case: 23-10180   Doc# 3   Filed: 04/12/23   Entered: 04/12/23 15:45:43   Page 3 of 10

pass-through entity for tax purposes whose revenues flow up to the Debtor and whose expenses and sole employee are in the name of and paid for by the Debtor. The Retail Store is only a 30-minute drive from the Cortland Facility and it advertises, promotes, and sells the Debtor's revolutionary soil on the retail market. Additionally, the Debtor also operates a research and development facility in the same facility as the Retail Store to continue to improve its on-the-market CEA soil and develop new products to achieve the founders' ultimate goal of improving crop quality, yields, and to solve the threat of dwindling topsoil and the instability of climate change.

II.     **Circumstances Leading to Chapter 11 Filing**

11.     The Stockton Facility, on its face, could have reached the Debtor's goals of doubling its production and reducing transcontinental transportation costs. However, the COVID-19 pandemic and its ensuing macroeconomic effects created insurmountable headwinds to reaching the Debtor's previously achievable and projected growth. The global economic shutdown caused obvious repercussions. The effects of the full-throttle restart of the economy were not expected. The cost to ship raw materials across the country to California in 2019 was approximately $3,000 per container. By 2021, when the Debtor was trying to get California up and running with raw materials, the cost to ship materials to California had tripled to as much as $9,000 per container. Moreover, the cost to complete the Stockton Facility increased to more than $1,000,000 and the pandemic's supply chain issues caused extended lead times for bio365 to obtain the required equipment. In other words, the Debtor was forced to carry the costs of the non-operational Stockton Facility for 6-8 months longer than expected.

12.     All of the macroeconomic effects created a nearly debilitating liquidity crisis for the Debtor. The Debtor's equity holders invested more than $21,500,000 in capital to build the company and keep it running throughout the turmoil. Yet, the constant influx of capital could not counterbalance the cash needed to continue to operate the cross-country operations of the Debtor. On May 2, 2022, to obtain access to additional capital, the Debtor refinanced its previously unencumbered equipment in Stockton, California with Farnam Street Financial, Inc. Yet, the refinance created further financial strain instead of ease. Then, starting in the Fall of 2022, the Debtor turned to merchant cash advance loans (collectively, the "MCA Loans") to fulfill its constant

need for liquidity and continue the dual facilities operations. Unfortunately, from October 2022 through February 2023, the Debtor took out more than $2,000,000 in MCA Loans that further drained its liquidity with the weekly automatic withdraws that strained the Debtor's bank accounts beyond recovery.

13. The MCA Loans, inability to complete the Stockton Facility, and transportation costs have weighed down the entire operations. In the Fall of 2022, the Debtor undertook efforts to renegotiate the terms of its contracts and outstanding liabilities with creditors. While some progress was made, not enough liquidity was created to sustain long-term stability for the Debtor. To this end, bio365 retained Clark Hill PLC (operating as Clark Hill LLC in California) and Kander to review its options and pursue long-term strength and steadiness for the company and its creditors.

### III. First Day and Subsequent Relief Requested

14. The Debtor filed this Bankruptcy Case to restructure and streamline its operations and propose a plan of reorganization to shed its burdensome operational deficiencies and emerge a healthier company buoyed by the strength of its unique product. Through the Chapter 11 filing, the Debtor intends to refocus its manufacturing through the fully operational Cortland Facility while simultaneously winding down operations in the Stockton Facility and Ithaca Retail Store. It is the Debtor's intention to propose a plan of reorganization that will permit the Debtor to maximize recoveries for its legitimate creditors, ensure the Debtor is only paying for the value it has received on its loans and contracts, and reach an EBITDA positive position within 12-18 months after emerging from bankruptcy. I have worked closely with the Debtor, its professionals, and my team to narrowly focus our targets in this Chapter 11 case to ensure a efficient and expeditious result for the Debtor, its employees, customers, and creditors.

15. I have prepared this Declaration to provide the Court the requisite insight to this Bankruptcy Case and detail the relief to be sought to keep the Debtor fully operational and maximize the value for creditors.

### A. Responsible Individual / Chief Restructuring Officer

16. On April 7, 2023, the Debtor engaged my services as CRO to oversee the financial restructuring and reorganization of the Debtor's operations. I am familiar with the Debtor's

operations and have visited the Stockton Facility, Cortland Facility, and Retail Store and met with the employees at all locations. I have also participated in the weekly sales team meeting and held regular calls with the accounting team and management. My team at Kander and I are focused on the financial restructuring and reorganization of the Debtor's operations to permit the officers, directors, and employees of bio365 to continue to manufacture its industry leading soil, transition to a more streamlined operations, and focus on the turnaround of the Debtor. Pursuant to Rule 4002-1 of the Bankruptcy Local Rules for the Northern District of California, I will serve as the designated responsible individual during the Chapter 11 case.

### B. Prepetition Employee Wages

17. As of the Petition Date, the Debtor had a total of thirty-eight (38) employees with its operational and manufacturing employees located primarily in or around Cortland, New York and Stockton, California. The Debtor's management team, accounting department, and sales team are spread across the country from coast-to-coast. As of the Petition Date, the Debtor had four (4) employees supporting operations in the Stockton Facility and fifteen (15) employees supporting operations in the Cortland Facility. There are three (3) employees located at the retail store with two (2) of these employees dedicated to research and development and the other one (1) working on retail sales. The Debtor's management and administrative teams consist of a total of eight (8) members and eight (8) sales team members.

18. The Debtor's hourly employees at the Cortland Facility are paid on a weekly basis each Friday for the preceding week. The Debtor is due to pay these employees on Friday, April 14, 2023 in an aggregate amount of $16,489.00 for the week preceding the Petition Date. The remainder of the Debtor's employees are paid on a bimonthly basis on the 5th and 20th day of each month. The payment on the 20th day of the month is for the 1st through the 15th of the same month. The payment on the 5th is for the period starting on the 16th day through the end of the month. On Thursday, April 20, 2023, the Debtor is due to pay all of its employees in an aggregate payroll amount of $111,583.00. These amounts reflect the regular, prepetition payroll for the Debtor. Michael Klein, the CEO, does not receive a salary. The Debtor currently has over $500,000 in cash and anticipates generating additional cash over the next payroll period to cover the second, larger

payroll period. Most of the Debtor's employees rely on the timely payment of their wages to pay for their household and living expenses. No creditors will be prejudiced by the payment of the prepetition wages as all of the wages were incurred in the fourteen (14) day period prior to the Petition Date and none of the wages exceed the § 507(a)(4) statutory maximum for priority wage claims.

     **C.**     **Motion to Provide Adequate Assurance of Utility Payments**

     19.     The Cortland Facility will remain the primary manufacturing facility for the Debtor's products with the Debtor winding down its inventory at the Stockton Facility and transitioning the Retail Store to a third-party purchaser. To this end, it is critical that the Debtor maintain utility service at each of its leased locations while such locations provide a benefit to the Debtor and bankruptcy estate. The Debtor's monthly average utilities for each of the locations is as follows:

    a.    Cortland Facility
         i.    National Grid (Electricity) - $5,000.00/month
         ii.    NYSEG (Gas) - $3,760.00
         iii.    Casella Waste (Waste) - $1,500.00/month
         iv.    Vonage (Telephone) - $811.00/month
         v.    Spectrum (Internet) - $98.00/month

    b.    Stockton Facility
         i.    Pacific Gas and Electric (Electricity) - $5,000.00/month
         ii.    WM Corporation Services, Inc. (Waste) - $3,000.00/month
         iii.    Vonage (Telephone) - $811.00/month
         iv.    Bay Alarm (Alarm System) – $590.00/month
         v.    AT&T (Internet) - $80.00/month

    c.    Retail Store
         i.    NYSEG (Electricity) - $760.00/month
         ii.    Casella Waste - $140.00/month
         iii.    Vonage (Telephone) - $811.00/month
         iv.    Town of Ithaca (Water) - $208.00/month

7
DECLARATION OF ROBERT MARCUS
271198035.v2

|   |   |   |
|---|---|---|
| 1 | v. | Spectrum (Internet) - $130.00/month |
| 2 | vi. | Maximum Security Alarms (Alarm) - $91.00/month |

(collectively, the "<u>Utility Companies</u>"). The Debtor submits that, given the relatively minimal monthly costs owed to the Utility Companies, that adequate assurance of payment through the retention of any prepetition deposit, administrative expense for any unpaid postpetition expense, and the opportunity to request additional adequate assurance of payment equal to an average monthly cost for such utility is appropriate. The Debtor's proposed adequate assurance, when complemented by the Debtor's on-going ability to pay the Utility Companies, alleviates – if not eliminates – any honest concern of non-payment on the part of the Utility Companies. The Debtor's continued receipt of uninterrupted utility services at each of its leased locations is critical to the Debtor's operations and restructuring efforts.

**D. Post-Petition DIP Financing**

20. The Debtor and its professionals have determined that winding down the operations of the Stockton Facility and Retail Store provide it the financial stability to turnaround its operations and operate without the need of outside cash for much of the anticipated 13-week budget period. Despite this positive attribute, at some point, the Debtor will require outside cash to finance its operations and, likely, a plan of reorganization. The Debtor's current senior secured creditor is Northview Capital LLC ("<u>Northview</u>"), which asserts a security interest in all assets of the Debtor, including all products and proceeds. Northview has filed a UCC-1 financing statement with the California secretary of state. The Debtor's non-leased equipment is also secured by individual purchase money security interests against the respectively purchased equipment. The MCA Loans would assert a security interest against the Debtor's accounts receivable. Yet, the MCA Loans are junior to Northview, indistinguishable on the secretary of state's lien records, and subject to objection on a variety of grounds, including, without limitation, California usury laws, violation of California Business & Professions Code § 17200 *et seq*, money had and received for recovery of usurious interest, and 11 U.S.C. § 547.

21. To ensure the Debtor has funds to operate through the Chapter 11 case and beyond, the Debtor sought third-party debtor-in-possession financing; however, the cost of third-party

financing would simply reignite a similar – but less draconian – liquidity crisis exacerbated by the MCA Loans. The traditional debtor-in-possession ("DIP") financing companies were charging interest rates of prime plus 12%-15%, in addition to origination and other costly fees. Michael Klein, one of the Debtor's founders and Chief Executive Officer ("Klein"), has stepped forward to offer DIP financing on terms substantially better for the Debtor, its estate, and creditors than that offered from third party lenders.

22. Klein has offered to extend a revolving line of credit to the Debtor, in an amount not to exceed $1,000,000, with an interest rate of prime (currently set at 8%). The DIP financing would fund the Debtor's operating expenses and administration of the Chapter 11 case, including the potential financing of a plan of reorganization, in accordance with the terms of a budget to be attached to the forthcoming motion (the "Budget"). The liens proposed would secure any of the Debtor's currently unencumbered assets, including its interests in the intellectual property and patents acquired in the Green Tree merger, and a senior lien on all other property of the Debtor to the extent required to cover the $1,000,000 line of credit. The Debtor believes that the current level of accounts receivable, valued at approximately $788,000, would leave Northview fully secured and adequately protected even if the Debtor drew the entirety of the line of credit. Moreover, Northview is further protected in that the Budget provides for monthly interest payments to Northview. The line of credit from Klein is by far the most financially reasonable and responsible access to cash for the Debtor and sets the Debtor on course for a successful reorganization.

**IV.  Conclusion**

23. I am familiar with the contents of each of the motions and applications referenced above, including any exhibits attached thereto, and the facts set forth in each motion and application is true and correct to the best of my knowledge. The relief sought in each of the motions and applications will provide for an orderly transition of the Debtor into this Chapter 11 case and ultimately permit the Debtor to streamline its operations, propose a successful Chapter 11 plan, and maximize recovery for its creditors and parties-in-interest. Further, I believe that the relief sought in each of the motions and applications referenced above is narrowly tailored and necessary to achieve the goals identified above and, accordingly, best serves the interests of the Debtor, its estate,

9
DECLARATION OF ROBERT D MARCUS
271198035.v2

and the various stakeholders in this Chapter 11 case.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: April 12, 2021

_____
ROBERT MARCUS
CHIEF RESTRUCTURING OFFICER
BIO365 LLC